UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
–––––––––––––––––––––––––––––––––––––––––– x
STATE OF NEW YORK and BASIL SEGGOS, as :
Commissioner of the New York State Department :
of Environmental Conservation,                        :
                                                                          :
     Plaintiffs,                                                :
                                                                          :
       - against -                                        :          **COMPLAINT**
                                                                          :
JARCO REALTY CO., INC. a/k/a JARCO         :          **Case No. 22-4329**
REALTY CO., LLC and 39-26 PROPERTY LLC  :
a/k/a ZHONG CHUANG PROPERTIES LLC a/k/a:
ZHONG CHAUNG PROPERTIES LLC,             :
                                                                          :
     Defendants.                                            :
                                                                          :
                                                                          :
–––––––––––––––––––––––––––––––––––––––––– x

     Plaintiffs State of New York and Basil Seggos, in his capacity as Commissioner

of the New York State Department of Environmental Conservation (DEC) (together,

the "State"), by their attorney Letitia James, Attorney General of the State of New

York, as and for their Complaint, allege as follows, upon information and belief:

## NATURE OF THE ACTION

    1.    This is an action under the Comprehensive Environmental Response,

Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601–9675 (CERCLA), as

amended, to recover costs that have been and will be incurred by the State in

responding to the release of hazardous dry cleaning chemicals into the environment

at and from the premises located at the former Bridge Cleaners site at 39-26 30th

Street, Long Island City, New York 11101 (the "Site").

2.     The defendants in this action—Jarco Realty Co., Inc. and 39-26 Property LLC—and non-party Alenat Properties, Inc. ("Alenat"), are currently subject to an administrative consent order with the New York State Department of Environmental Conservation ("DEC") that requires them to take actions to clean up contamination at the Site and to pay the oversight costs that DEC incurs in connection with those actions after August 6, 2018.  The administrative consent order reserves DEC's right to seek costs that it incurred before August 6, 2018, and costs that it incurs after that date that are not covered by the order.

3.     In this action, the Sate seeks an award of costs incurred by DEC before the consent order, as well as costs incurred by DEC and DOH in connection with off-site contamination, which is not covered by the consent order.

4.     The State therefore seeks (1) a declaratory judgment that all the defendants are liable for the State's costs in responding to the release of hazardous substances at the Site and (2) an award of costs incurred by DEC and New York State Department of Health ("DOH") before August 6, 2018, as well as costs incurred by DEC and DOH after that date in connection with off-site contamination that is not covered by the consent order.

## JURISDICTION AND VENUE

5.     This Court has exclusive jurisdiction over this action, which arises under the laws of the United States, pursuant to 28 U.S.C. §§ 1331 and 2201 and 42 U.S.C. §§ 9607 and 9613.  The Court also has jurisdiction to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. § 9613.

6.     Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the release of hazardous substances that gives rise to this action occurred within this District and the Site is located within this District.

## THE PARTIES

### A.   Plaintiffs

7.     Plaintiff State of New York brings this action to recover costs that have been and will be incurred by the State in responding to the release of hazardous substances at and from the Site.

8.     Plaintiff Basil Seggos is the Commissioner of the New York State Department of Environmental Conservation.   Commissioner Seggos brings this action in his official capacity to recover costs that have been incurred and will be incurred by DEC in responding to the release of hazardous substances at and from the Site.

### B.   Defendants

9.     Defendant Jarco Realty Co., Inc. ("Jarco") owned the Site from 1982 until 2011. From 1997 until 2011, during Jarco's ownership of the Site, a succession of dry cleaning businesses operated at the Site, during which time hazardous substances were disposed of at the Site.   Jarco is a New York corporation with a registered address of 95 Dutch Hill Road, Orangeburg, New York 10962.

3

10.     Defendant 39-26 Property LLC, formerly known as Zhong Chuang Properties LLC (hereinafter "39-26 Property LLC"),[1] has owned the Site since March 9, 2012. It is a New York limited liability company with a registered address of 45 East 22nd St, Apt 15B, New York, New York 10010.

## STATUTORY AND REGULATORY BACKGROUND

11.     Under CERCLA, when there is a release of hazardous substances into the environment from a facility, certain categories of persons are liable to the State for the costs that the State incurs to respond to the release as long as the State's response actions are "not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a).

12.     "Hazardous substances" are defined in 42 U.S.C. § 9601(14) to include substances that EPA has designated as hazardous pursuant to 42 U.S.C. § 9602. These substances are listed in 40 C.F.R. § 302.4.

13.     A "release" includes spilling, leaching, and disposing "into the environment." *Id.* § 9601(22). The "environment" includes groundwater, land surface, subsurface strata, and ambient air. *Id.* § 9601(8).

---

[1] On December 14, 2015, Zhong Chuang Properties LLC officially changed its name to 39-26 Property LLC. In a deed dated September 18, 2020, Zhong Chuang Properties LLC transferred ownership of the Site to 39-26 Property LLC. For the sake of consistency and clarity, this Complaint will refer to the entity only as 39-26 Property LLC, even when the underlying documentation references the former name Zhong Chuang Properties LLC or Zhong Chaung [sic] Properties LLC.

14.     A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). It also includes buildings, structures, and equipment. *Id.*

15.     The term "respond" includes taking "removal" actions, "remedial" actions, and related enforcement activities. *Id.* § 9601(25). A "removal" action includes the "cleanup or removal of released hazardous substances from the environment" as well as "such actions as may be necessary to monitor, assess, and evaluate the release or threatened release of hazardous substances." *Id.* § 9601(23). Removal actions include "clean-up or removal measures taken to respond to immediate threats to public health and safety." *State v. Next Millennium Reality, LLC*, 732 F.3d 117, 124-25 (2d Cir. 2013). A "remedial" action means "those actions consistent with permanent remedy taken instead of or in addition to removal actions." *Id.* § 9601(24).

16.     The "national contingency plan" is set forth in 40 C.F.R. Part 300.

17.     The persons liable for response costs under 42 U.S.C. § 9607(a) include: (i) current owners and operators of a facility; and (ii) any person who owned or operated a facility at the time of disposal of hazardous substances. The term "person" includes individuals as well as corporations and other business entities. 42 U.S.C. § 9601(21).

18.     42 U.S.C. § 9613(g)(2) provides that in an action for response costs under CERCLA, "the court shall enter a declaratory judgment on liability for response costs

5

or damages that will be binding in any subsequent action or actions to recover further response costs or damages."

19.    DEC is responsible for implementing New York's inactive hazardous waste disposal site remedial law, also known as the State Superfund Law, Environmental Conservation Law (ECL) § 27-1301 *et seq.*, which works in a complementary fashion with CERCLA. As part of implementing the State Superfund law, DEC (1) identifies, lists, and classifies hazardous waste disposal sites, *see id.* § 27-1305; 42 U.S.C. § 9605(c); and (2) remediates such sites consistent with certain regulatory criteria, *see* 6 New York Comp. Codes R. & R. Part 375; 40 C.F.R. Part 300.

20.    In cases where a responsible party cannot be found or is unwilling to respond to all or part of the contamination at a site, state law authorizes DEC to use funds from the hazardous waste remedial fund to respond to the contamination, N.Y. State Finance Law § 97-b, and CERCLA authorizes DEC to sue for recovery of those costs.  42 U.S.C. 9607(a).

21.    With respect to soil contamination, DEC has established "soil cleanup objectives" for particular contaminants that "eliminate or mitigate all significant threats to the public health and to the environment presented by contaminants disposed at the site through the proper application of scientific and engineering principles and in a manner not inconsistent with the national oil and hazardous substances pollution contingency plan as set forth in section 105 of CERCLA." 6 NYCRR § 375-2.8. These soil cleanup objectives are set out in 6 NYCRR § 375-6.8.

22.     With respect to soil vapor intrusion, the process by which certain hazardous chemicals move from the soil to the air within a building, DOH has established guidance that specifies the sub-slab (*i.e.*, below ground) vapor concentrations and indoor air concentrations of eight contaminants at which monitoring or mitigation is recommended.

23.     With respect to groundwater, DEC has established ambient water quality standards and guidance values for groundwater, which are set out in 6 NYCRR Part 703 and other guidance documents, including the DEC Division of Water's Technical and Operational Guidance Series (TOGS) 1.1.1.

## FACTUAL ALLEGATIONS

### A.     The Site and Dry Cleaner Operations at the Site

24.     The Site is a 0.17-acre lot located at 39-26 30th Street, Long Island City, New York, between 39th Avenue and 40th Avenue.  It is identified on the Queens County tax map as Tax Block 399, Lot 31, and is currently zoned for mixed residential and commercial use.

25.     The entire Site is covered by a 7,500 square foot one-story concrete building, 75 feet by 100 feet, with finished concrete floors and no basement.

26.     The Site is bordered by a mixed-use building to the south and a church to the north.  An apartment building is located opposite to the Site on the other side of 30th Street, while other structures abut the rear of the Site, including a commercial building and an apartment building on 29th Street.

27.     Jarco owned the Site from 1982 to 2011.

7

28.    A series of companies operated dry cleaners at the Site during Jarco's ownership. Each of these dry cleaners used a solvent called tetrachloroethene (PCE or perc), a volatile organic chemical commonly used in dry cleaning.

29.    A boiler room was located in the northern portion of the building. PCE used in retail dry-cleaning establishments is frequently stored, handled, and used in boiler rooms. Leaks and spills occur in many ways, including when pouring PCE from one vessel into another, or when PCE-contaminated filters are being transferred and stored improperly.

30.    EPA has designated PCE and its breakdown products trichloroethene (TCE) and 1-,2-dichloroethene (1,2-DCE) as hazardous. 40 C.F.R. § 302.4.

31.    PCE is toxic to the central nervous system, kidney, liver, reproductive system, and developing fetuses. Short-term acute exposure to PCE can cause dizziness, headaches, unconsciousness, and even death. In addition, PCE is likely carcinogenic.

32.    TCE is a carcinogen that may cause kidney cancer, liver cancer, and malignant lymphoma. Short-term exposure to high concentrations of TCE can cause dizziness, headaches, lack of coordination, unconsciousness, liver damage, possible kidney damage, and even death.

33.    1,2-DCE causes adverse effects to the blood and liver. Short-term exposure to high concentrations of 1,2-DCE can cause nausea, drowsiness, and even death.

34.   From 1997 to 2002, non-party Park East French Cleaning Corp., which no longer exists, operated a dry cleaner at the Site.

35.   From 2002 to 2004, non-party Queens Bridge Cleaners, Inc., which no longer exists, operated a dry cleaner at the Site.

36.   From 2004 to 2006, non-party Jetomi Cleaners, Inc. ("Jetomi Cleaners"), which no longer exists, operated a dry cleaner at the Site, doing business during that time under the names Queens Bridge Cleaners and Bridge Cleaners.

37.   While it was operating at the Site, Jetomi Cleaners increased its use of PCE from under 1,050 gallons annually to over 1,050 gallons, as reflected in its moving from a "Minor Facility Registration," for facilities that use less than 1,050 gallons per year of PCE, to a "State Facility Air Permit," for facilities that use more than 1,050 gallons per year.

38.   During this same time period, EPA found that Jetomi Cleaners was improperly storing waste products contaminated with PCE in violation of the Resource Conservation and Recovery Act (RCRA) and that it had also failed to use hazardous waste manifests to document the shipment and disposal of more than 1,200 pounds of hazardous waste generated at the Site between 2004 and 2006.

39.   On May 18, 2006, EPA issued a notice of violation to Jetomi Cleaners citing nine RCRA violations.

40.   In response to the notice of violation, Jetomi Cleaners admitted that it was generating approximately 90 gallons (690 pounds) of PCE wastewater per month, and that from June 2004 through December 2005, "there was confusion on how to

dispose of the [PCE] wastewater" and that "[s]ome of the wastewater was poured into the POTW [*i.e.*, publicly owned treatment works]."

41.    From 2006 to 2011, non-party Queens Boro operated a dry cleaner at the Site under the management of non-party Kook Rip Kim.

42.    Queens Boro operated pursuant to the State Facility Air Permit until October 8, 2010, when, after decommissioning a large dry cleaning machine, it downgraded to an Air Facility Registration.

43.    By August 18, 2011, the Site was vacant and dry cleaning operations had ceased.

44.    The Site is currently rented to a fabric cutting business and commercial laundry that does not conduct dry cleaning operations.

**B.    Listing of the Site as a Potential Hazardous Waste Site**

45.    In 2007, the potential purchaser of a property adjacent to the Site, commissioned an investigation of that property, 39-27 29th Street.

46.    In 2010, the investigation found contamination in the part of 39-27 29th Street bordering the Site, prompting DEC to commence an investigation to determine whether the Site should be listed as a potential inactive hazardous waste site.

47.    In a report dated March 26, 2010, DEC found that "[g]roundwater sampling at an adjacent property (39-27 29th Street) confirms that chlorinated solvents are present in the groundwater at levels above the NYS Groundwater and Drinking Water Standard." The chlorinated solvents included PCE and TCE, two of the hazardous substances at issue here.  The report further found that "[t]he higher

groundwater concentrations" within the adjacent property were found in the area bordering the Site and that "[a] more thorough investigation that includes more groundwater, soil and soil vapor sampling is required to identify a possible source area."

48.   On October 28, 2010, DEC sent a letter to Jarco explaining that DEC has a legal obligation to "investigate all suspected or known inactive hazardous waste disposal sites" and that DEC had "received information which leads [DEC] to suspect that hazardous waste has been disposed at the site." DEC announced its intention to designate the Site as a "potential inactive hazardous waste disposal site."

49.   In November 2010, DEC designated the Site as a potential inactive hazardous waste disposal site and requested that Jarco sign an agreement to either perform an investigation with DEC oversight or allow DEC to perform an initial investigation.

50.   Jarco refused to sign the agreement.

51.   On March 2, 2011, DEC notified Jarco that, if it failed to sign and submit the agreement to either perform an investigation with DEC oversight or allow DEC to perform an initial investigation by April 1, 2011, DEC would "use state funds to undertake the site characterization."

52.   On March 31, 2011, Jarco's attorney responded that he had advised Jarco not to sign the agreement and that Jarco's consultant, Long Island Laboratories, Inc., was conducting an investigation and would share the results of that investigation with DEC when available.

53.     On September 1, 2011, Long Island Laboratories, Inc., issued a report that found levels of PCE contamination in the Site's groundwater as high as 1,470 µg/L, greatly exceeding the New York State organic contaminant standard for groundwater, which is only 5 µg/L.

54.     On November 9, 2011, Jarco shared the report with DEC but argued that the data showed that the contamination originated elsewhere.

55.     On November 18, 2011, DEC e-mailed Jarco, requesting access to the site for the purpose of installing three groundwater monitoring wells within the building and to take three additional subsurface soil samples.

56.     On November 21, 2011, Jarco's counsel refused to give DEC access to the Site.

C.     **Transfer of the Site**

57.     On December 16, 2011, Jarco transferred the property to non-party Alenat, an entity owned and controlled by non-party Jeffrey Cohan, the principal of Jarco.

58.     On March 9, 2012, Alenat sold the property to 39-26 Property LLC (then called Zhong Chuang Properties LLC).

D.     **The Brownfield Cleanup Agreement for the Site**

59.     On May 9, 2012, DEC sent a letter to 39-26 Property LLC once DEC learned 39-26 Property LLC acquired the property.  This letter advised 39-26 Property LLC that DEC was in the process of determining whether to list the Site on the New York State Registry of Inactive Hazardous Waste Disposal Sites, pursuant

12

to the State Superfund Law. *See* ECL § 27-1301 *et seq*. This letter also advised that a decision was due May 17, 2012 and should 39-26 Property LLC wish to enter the Brownfield Cleanup Program and avoid the Site being listed on the State Registry, it should submit a Brownfield Cleanup Program application by a date certain.

60.    The Brownfield Cleanup Program offers tax incentives and liability relief for the cleanup and redevelopment of brownfield sites. The goal is to encourage private-sector cleanup and redevelopment of brownfield sites across New York State as a means to revitalize economically and environmentally blighted communities.

61.    A Brownfield Cleanup Agreement is required for participation in the Brownfield Cleanup Program. By executing a Brownfield Cleanup Agreement, an applicant makes a commitment to undertake certain remedial activities under DEC's oversight.

62.    Under the Brownfield Cleanup Program, an applicant is classified either as a "participant" or as a "volunteer."

63.    A "participant" is an applicant who was the "owner of the site at the time of the disposal or discharge of contaminants" of who is otherwise liable for any reason except being a subsequent owner or operator. ECL § 27-1405(1)(a).

64.    A "volunteer" is an applicant "whose liability arises solely as a result of such person's ownership or operation of or involvement with the site subsequent to the disposal or discharge of contaminants." ECL § 27-1405(1)(b).

65.    To participate in the program, volunteers are required to take reasonable steps to (i) stop any continuing release; (ii) prevent any threatened future

release; and (iii) prevent or limit human, environmental, or natural resource exposure to any previously released contamination. ECL § 27-1405(1)(b).

66.     DEC may terminate a Brownfield Cleanup Agreement if the applicant fails to substantially comply with its terms and conditions.

67.     On May 17, 2013, 39-26 Property LLC entered into a Brownfield Cleanup Agreement with DEC as a "volunteer" for cleanup of the Site.

68.     The agreement required 39-26 Property LLC to submit work plans that addressed the on-site contamination of the Site for review and approval by DEC and to adhere to deadlines for completing the work set out in those work plans.

E.     **Remedial Investigation of On-Site Contamination**

69.     Pursuant to the Brownfield Cleanup Agreement, on June 29, 2014, 39-26 Property LLC's consultant, TechSolutions Engineering, P.C. ("TechSolutions") submitted a remedial investigation report to DEC.

70.     The report showed the presence of PCE and two of its breakdown products, TCE and 1,2-DCE, in the soil vapor and groundwater at concentrations that exceed applicable vapor exposure guidance and groundwater standards respectively.

*i.     PCE, TCE, and 1,2-DCE in soil vapors*

71.     When volatile organic chemicals such as PCE, TCE, and 1,2-DCE are present in soil, they vaporize and enter buildings through cracks in the building's foundation.

72.     As outlined in the remedial investigation report, TechSolutions took seven samples from beneath the foundation of the building on the Site and found

14

levels of PCE and TCE that were high enough to trigger a mitigation recommendation in all seven locations. In two locations, the investigation found levels of 1,2-DCE that were high enough to trigger a mitigation recommendation.

73.    The highest concentrations of PCE and TCE in soil vapor were found in the northern portion of the building.

74.    TechSolutions' investigation detected a soil vapor concentration of 668,000 µg/m³ for PCE, greatly exceeding the threshold for mitigation, which ranges from 100 µg/m³ to 1,000 µg/m³ for PCE.

75.    The investigation also detected a soil vapor concentration of 2,140 µg/m³ for TCE also greatly exceeding the mitigation threshold, which is between 6 µg/m³ and 60 µg/m³ for TCE.

76.    Finally, the investigation detected a soil vapor concentration of 1,590 µg/m3 for 1,2-DCE, again greatly exceeding the mitigation threshold, which is between 6 µg/m³ and 60 µg/m³ for 1,2-DCE.

### ii.    PCE in groundwater

77.    To investigate the groundwater on the Site, TechSolutions took samples from five on-site groundwater testing wells.

78.    Groundwater at the Site generally flows from north, where the highest soil vapor concentrations were detected, to the south.

79.    PCE concentrations in groundwater at the Site ranged from 165 µg/L to 340 µg/L, significantly exceeding the New York State organic contaminant standard

for groundwater, which is only 5 µg/L.  The groundwater concentrations were highest in the southern portion of the Site.

### iii.     PCE in soil

80.    In December 2014, Integral Engineering, P.C. investigated the soil at the Site on behalf of 39-26 Property LLC.

81.    PCE was identified in soil samples collected from underneath the building in the northern portion of the Site with a maximum concentration of 9.6 mg/kg.  These levels exceeded the soil cleanup objectives for PCE, which are 1.3 mg/kg.

## F.    <u>Interim Remedial Design Report for On-Site Contamination</u>

82.    On March 29, 2016, 39-26 Property LLC submitted an Interim Remedial Measure Design Document ("IRM") for a "removal action," *see* paragraph 17 above, consisting of an air sparge and soil vapor extraction system ("air sparge system") that would remove contamination from the soil and groundwater as well as soil vapor from inside the building.

83.    The IRM provided that the air sparge system would be installed by July 22, 2016 and system start-up and balancing would be completed by July 29, 2016.

## G.    <u>Termination of the Brownfield Cleanup Agreement</u>

84.    39-26 Property LLC failed to meet the schedule set out in its approved IRM and also failed to meet the extended deadlines granted by DEC.

85.    On December 2, 2016, DEC terminated the Brownfield Cleanup Agreement on the basis that 39-26 Property LLC had: (a) failed to meet an extended deadline of November 30, 2016 to complete installation, start-up and balancing of the air sparge system; and (b) "consistently displayed an inability to satisfy the requirements of the program," including by "fail[ing] to supply an acceptable schedule for the remedial program on multiple occasions."

86.    On January 20, 2017, following the dissolution of the Brownfield Cleanup Agreement, DEC sent a letter by certified mail to 39-26 Property LLC to notify the owner of the Site's inclusion in the State's Registry of Inactive Hazardous Waste Disposal Sites as a "Class 2" significant threat to the public health or environment that requires response action.    *See* New York Environmental Conservation Law § 27-1305.

**H.    Administrative Consent Order**

87.    On August 6, 2018, DEC entered into an order on consent and administrative settlement (the "Consent Order") with Alenat, Jarco, and 39-26 Property LLC (then called Zhong Chuang Properties LLC).

88.    Alenat, Jarco, and 39-26 Property LLC agreed in the Consent Order to pay DEC's oversight costs with respect to on-site contamination after the Order's effective date.

89.    The Consent Order did not address off-site contamination and reserved DEC's right to seek recovery of any past or future costs not paid pursuant to the Consent Order and the respondents' right to contest those costs. Under the terms of

17

the Consent Order, Alenat, Jarco, and 39-26 Property LLC were specifically required to complete installation of the air sparge system and submit, among other things: (1) a construction completion report for the system within 30 days after the effective date of the Consent Order; and (2) a site management plan to address the ongoing operation, maintenance and monitoring of the system within 60 days of the effective date.

90.    Alenat, Jarco, and 39-26 Property LLC submitted the construction completion report and site management plan to DEC and 39-26 Property LLC granted DEC the easement.

91.    On October 16, 2018, DEC rejected the construction completion report because it did not contain the monitoring data necessary to demonstrate that the air sparge system was reducing contamination.  Alenat, Jarco, and 39-26 Property LLC submitted an amended construction completion report in December 2018 and additional data on June 3, 2019.

92.    On June 12, 2019, upon reviewing the report, DEC informed Alenat, Jarco, and 39-26 Property LLC that the air sparge system was not successfully reducing groundwater contamination in the vicinity of one of the groundwater testing wells on the Site designated as GW-2.

93.    DEC further informed Alenat, Jarco, and 39-26 Property LLC that they must either install additional air sparge wells to address contamination at groundwater testing well GW-2 or invoke dispute resolution in accordance with the Consent Order.

94.     On June 27, 2019, Alenat invoked dispute resolution.

95.     On November 4, 2019, DEC issued a dispute resolution decision that concluded that the current system would need to be enhanced with an additional sparge well or wells to address the contamination in the vicinity of groundwater testing well GW-2.

96.     As the decision explained, the groundwater data submitted by the respondents showed that there had been "very little change" in groundwater concentrations of PCE around that well.

97.     On January 8, 2020, DEC requested the preparation of a Supplemental Interim Remedial Measure Work Plan ("Supplemental Plan") for installation of the additional air sparge well or wells.

98.     In response to DEC's request, Alenat retained TechSolutions to prepare a Supplemental Plan.

99.     The Supplemental Plan prepared by TechSolutions recommended installation of two additional air sparge wells, among other measures, to address contamination at the Site and was implemented in September 2020.

I.      **DEC's Investigation and Response Actions Concerning the Off-Site Area**

100.    At the same time as DEC was overseeing the on-site air sparge system, DEC was also investigating off-site contamination, including soil vapor in off-site buildings and groundwater contamination.

19

101.   DEC designated the off-site investigation area as operable unit number two (OU-2), while designating the Site itself (*i.e.*, the on-site area) as operable unit number one (OU-1).

102.   The off-site investigation area encompasses sidewalks along 29th Street from 39th Avenue to 40th Road, along 30th Street from 39th Avenue to approximately 40th Avenue, and along 40th Avenue to 31st Street.

103.   In February 2012, DEC commenced its investigation of the off-site area by contracting with Ecology and Environment Engineering, P.C., to perform a site characterization—that is, an investigation of the nature and extent of contamination at a location—which would include the off-site monitoring.

104.   The site characterization report dated May 2012 showed PCE in off-site groundwater at a concentration of up to 440 parts per billion (ppb), far exceeding the applicable standard of 5 ppb.

105.   In July 2013, DEC referred the off-site area to its inactive hazardous waste disposal site program for the development and implementation of a remedial investigation and feasibility study as well as interim remedial measures, using the State Superfund.

106.   In December 2015, DEC contracted with Dvirka & Bartilucci and TRC Engineers, Inc. to perform an off-site remedial investigation.

107.   In June 2017, TRC Engineers, Inc. submitted to DEC a remedial investigation report for the off-site area that indicated that (1) levels of PCE and TCE in soil vapor in off-site buildings were sufficient to trigger a recommendation to

mitigate or monitor the solid vapor and that (2) PCE and TCE were present in off-site groundwater in excess of standards.

108.   DEC collected soil vapor samples from eleven soil vapor points in the off-site investigation area between September 2016 and December 2016.  The highest soil vapor detected was 4,400 ug/m3 for TCE and 2,400 ug/m3 for PCE on the south side of 40th Avenue.

109.   Sub-slab (beneath the foundation) samples and indoor air samples were taken from four buildings. The highest sub-slab level of PCE was 9,500 ug/m3.  The highest indoor air concentration of PCE was 7.2 ug/m3.  These results triggered a recommendation to mitigate soil vapor in one building, a recommendation to mitigate and monitor soil vapor in another building, and a recommendation to monitor soil vapor at a third building.

110.   DEC tested groundwater at eight new wells and seven pre-existing wells.

111.   PCE was detected at a maximum concentration of 216 ppb in groundwater, exceeding the applicable standard of 5 ppb, but less than 440 ppb, the maximum concentration previously noted in the site characterization report of 2012.

112.   TCE was detected at a maximum of 272 ppb, exceeding the standard of 5 ppb.

113.   In November 2017, DEC contracted with Groundwater & Environmental Services, Inc. (GES) to perform testing, design, and implementation of a sub-slab depressurization system to treat soil vapor in one off-site building.

(Since the samples were collected, DOH revised the criteria, which changed the status to monitor.) That system was completed in October 2018 and continues to operate.

114.   In addition, between July and December 2018, GES performed sub-slab and indoor air sampling at a building that had previously declined to participate in sampling.

## J.   DEC Issues the Record of Decision

115.   On March 27, 2022, DEC issued a Record of Decision (ROD).

116.   In the ROD, DEC explained that, because of the success of the removal actions described above, including the on-site air sparge system and the sub-slab depressurization system in one off-site building, no remedial action was necessary.

117.   DEC explained  that the air sparge system would need to continue to be operated and institutional and engineering controls would need to be implemented. These controls, which are designed to protect against exposure to contaminated water and soil, include measures such as restricting the use of groundwater as potable or process water, a cover over areas not occupied by buildings, unless exposed soil meets applicable soil standards, and an excavation plan that details how future excavation of contaminated areas will be managed.

## K.   State's Costs

118.   The  State's  unreimbursed  costs  from  responding  to  on-site contamination before the Consent Order and an off-site contamination before and after the Consent Order are approximately $587,562.17.

## CLAIM FOR RELIEF

## COST RECOVERY UNDER CERCLA

119.   The State hereby incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

120.   The Site is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

121.   Buildings, structures, and equipment where hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located at the Site are also "facilities" under 42 U.S.C. § 9601(9).

122.   There have been "releases" of "hazardous substances," as those terms are defined in 42 U.S.C. §§ 9601(14) and (22), at and from the Site and other facilities at the Site into the environment.

123.   Among the hazardous substances that were released into the environment at and from the Site and other facilities at the Site are the PCE, TCE, and 1,2-DCE.

124.   Those hazardous substances contaminated the "environment" within the meaning of 42 U.S.C. § 9601(8).

125.   The State has incurred costs, and will continue to incur costs, to "respond," as that term is defined in 42 U.S.C. § 9601(25), to the release of the hazardous substances at and from the Site and other facilities at the Site, including costs to assess, monitor, evaluate, oversee, and conduct response actions.

126.   Pursuant to 42 U.S.C. § 9607(a), persons who are current owners or operators of a facility and persons who were owners or operators at the time that

hazardous substances were disposed of shall be liable for the costs of removal and remedial actions that are "not inconsistent with the national contingency plan."

127.    The response actions that the State has taken and will take to respond to the release of hazardous substances at the Site are not inconsistent with the "national contingency plan." *See* 40 C.F.R. Part 300.

128.    The defendants are "persons" within the meaning of 42 U.S.C. § 9601(21).

129.    Jarco owned the Site when hazardous substances were disposed at the Site and is thus an owner at the time of disposal within the meaning of 42 U.S.C. § 9607(a)(2).

130.    39-26 Property LLC, formerly known as Zhong Chuang Properties LLC, currently owns the Site and is thus the current owner of the Site within the meaning of 42 U.S.C. § 9607(a)(1).

131.    Under 42 U.S.C. § 9607(a), the defendants are strictly, and jointly and severally, liable to the State for response costs incurred by the State as a result of the release or threatened release of hazardous substances at and from the Site and other facilities at the Site, including the response costs the State incurred in connection with on-site contamination before Consent Order and the response costs the State incurred in connection with off-site contamination.

## PRAYER FOR RELIEF

WHEREFORE, the State requests judgment in its favor and against all defendants upon the claims set forth above and requests that this Court enter judgment against the defendants, as follows:

1.    Declaring the defendants to be strictly, and jointly and severally, liable to the State under CERCLA for all the State's costs and expenses, including interest, attorneys' fees, and other costs of enforcement in responding to the release of hazardous substances at and from the Site and other facilities at the Site.

2.    Awarding the State against defendants, jointly and severally, all costs and expenses, including interest, attorneys' fees, and other costs of enforcement incurred by the State in responding to the release of hazardous substances at and from the Site and other facilities at the Site before the effective date of the Consent Order.

3.    Ordering such other and further relief, in law or in equity, as the Court deems just and proper.

Dated:      New York, New York
            July 22, 2022

                        LETITIA JAMES
                        Attorney General of the State of New York
                        *Attorney for Plaintiffs*

                        By: _Yueh-ru Chu_
                        Yueh-ru Chu
                        Section Chief, Affirmative Litigation
                        Environmental Protection Bureau
                        28 Liberty Street, 19th Floor
                        New York, New York 10005
                        212-416-6588
                        Yueh-ru.Chu@ag.ny.gov